# EXHIBIT A

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  rclark9314@aol.com

### March 13, 2026

Gustavo Magaña, Esq.
The Law Office of Gustavo Magaña
4701 Patrick Henry Dr. Bldg 16 Suite 15F
Santa Clara, CA 95054

**Regarding:    *Angelique Lopez, Andrew Cervantes, Alberto Ramirez, a minor, by and through guardian ad litem Sandra Lopez, v. City of San Jose, Ryan Reynolds in his individual and official capacity, Walid Hoqoq in his individual and official capacity, Kevin McClure in individual and official capacity.  Case No.: Case N.: 5:24-cv-07926-NC***

Dear Mr. Magaña:

Thank you for retaining me to analyze and render opinions regarding the May 5, 2024 use of excessive force and arrest inflicted on Ms. Angelique Lopez (Angelique), minor Alberto Ramirez (Alberto), and general use of excessive force on Mr. Andrew Cervantes (Andrew) by City of San Jose Police Department (SJPD) Sergeant Kevin McClure (Sergeant McClure) and Officers Ryan Reynolds (Officer Reynolds), and Walid Hoqoq (Officer Hoqoq).  Pursuant to the requirements of Rule 26, I have reviewed the Complaint, audio/video (BWC) recordings, reports, interviews, deposition transcripts, photographs and other material (as listed below) provided to me thus far regarding this case.  Please be advised that if/when any required additional material is submitted, a supplemental report will obviously be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where the Defendant's account of events differ from those alleged by the Plaintiff's, I do not opine for the trier of fact regarding who are the more believable witnesses.  I consider that the resolution of any such conflicts are obviously within the purview of a jury to decide.

Additionally, it is necessary to state that I am not a lawyer nor a public official who hears and decides cases brought in court.  My opinions rest on the training given to every

Page 1 of  31

certified law enforcement officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every California POST certified law enforcement officer - including the defendants in this incident.

**Materials provided and reviewed thus far:**

1.  Complaint.

2.  Defendant Response:
    a.  Police Reports:  SJ0001 - SJ0169.
    b.  Event Details Report:  SJ0170 - SJ0182.
    c.  Photographs and Screen-shots:  SJ0183 - SJ02233.
    d,  Claims Against City of San Jose  SJ0234 - SJ0240.
    e.  EFRC Analysis:  SJ0241 - SJ0253.
    f.  SJPD Duty Manual SJ0253 - SJ1207.
    g.  Axon Body Worn Videos (BWC).
    h.  Video_2023-02-22_2126_X60A4550P.
    i   Video 2023-02-22_2126_X60AA2850.
    j.  Video 2023-02-22_2127_X60A7377P.

4.  Video/Audio Recordings.
    a.  Axon: X60A7577G (Hospital), 2024-05-06,  01:24:02 - 01:31:59.
    b.  Axon: X60A7591J (Scene), 2024-05-05, 22:23:08 - 23:22:37.
    c,  Axon: X60A7577G (Scene), 2024-05-05, 22:33:17 - 22:58:54.
    c,  Axon X60A7376A (Scene), 2024-05-05, 22:33:08 - 23:04:50.
    d.  Scene Surveillance.

5.  Deposition Transcripts:
    a.  Officer Ryan Reynolds, October 27, 2025.
    b.  Officer Walid Hoqoq October 30, 2025.
    c.  Sergeant Kevin McClure, November 4, 2025.
    d.  Lieutenant Lee Tassio, January 22, 2026.
    e.  Andrew Cervantes, February 5, 2026.
    f.  Alberto Ramirez, February 10, 2026.
    g.  Angelique C. Lopez, February 12, 2026.

6. California POST Basic Learning Domains:
   a. #1: "Leadership, Professionalism & Ethics."
   b. #2: "Criminal Justice System."
   c. #5: "Introduction to Criminal Law."
   d. #11: "Juvenile Law and Procedure".
   e. #15: "Laws of Arrest."
   f. #20: "Use of Force/Deescalation ."
   g. #21:"Patrol Techniques"
   h. #23: "Crimes in Progress."
   i #24: "Handling Disputes/Crowd Control."
   j. #33: "Arrest and Control."
   k. #34: "First Aid and CPR."
   l. #36: "Information Systems."

7. *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).

8. Overview of the incident scene via the internet.

**Overview of Incident and Commentary:**

On May 5, 2024, a group people congregated near the intersection of 3090 Monterey Road in San Jose for the purpose of celebrating Cinco De Mayo. Many people stood in parking lots, on sidewalks and were generally near the streets, as they anticipated the arrival of custom vehicles cruising the roads and boulevards.

Although the city of San Jose had previously outlawed cruising which San Jose city council member Raul Peralez noted was used as a "tool to perpetuate and give legal credibility to racial discrimination." Accordingly, the ban on assembling and cruising was retracted and people and vehicles were permitted to be in the area.

Among the throngs of people were the Plaintiffs, Angelique Lopez ("Angelique"), Alberto Ramirez ("Alberto"), and their father Andrew Cervantes ("Mr. Cervantes"). They were in the area having a fun time with family and friends.

At some point, Angelique noticed a commotion across the street and realized that it was her close friend–a female. Therefore, Angelique walked across the street and approached her friend, who lay on the ground as a result of the commotion. SJPD officers were on scene. As Angelique walked to her fallen friend, she was suddenly, and without warning, pushed down by a San Jose police officer. Events occurred from that point:

Q.· So you saw Milly on the ground.  Did you see how she got to the ground?

A. No.  I did not see how she got to the ground.

Q. Did you -- from what you did see, did you have any impression of how she got to the ground?

A. No.

Q. No.  All right.  Did you have any impression of who might have caused her to be on the ground?

A. No.  At that moment, no.  I was just shocked.

Q. Okay.  And so you saw her on the ground.  And you said there was a police officer near her?

A. Yes.

Q. Were there multiple in her immediate vicinity or just the one?

A. Multiple.

Q. Okay.  But there was one that was closest to her?

A. Yes.

Q. Did he appear or -- was it a he or a she?

A. A he.

Q. Did he appear to be focused on Milly?

A He was like over her and, like, looking around and stuff, but he wasn't like, you know, focused on her.  He was just over her.

Q.· Okay.  Were any of the police in her immediate vicinity, did they appear to be focused on her?

A. No.

Q. And what did you do next?

A. That's when I -- I had seen her on the ground. I ran up towards her to see what was going on, what's wrong with her, and then that's when -- yeah, that's what I did.

Q. I may come back and ask some more detailed questions, but could you just -- starting from that point, you know, walk me through what you remember happening from that point forward?

A. Like everything?

Q. Yeah.

A. Okay.  So I remember seeing Milly on the floor.  My first thought was, "What's going on?  What is wrong with her?  Is she okay?"  I ran towards her.  I'm not running towards the cops.  I'm running towards her.  The cop pushes me.  He has his arm out, and he pushes me.  I fall to the ground on my bottom.  And then my brother and my aunt's girlfriend, they both started running up.  And then my brother, he starts, like, getting in front of me to try to protect me from the cop

because I was on the ground.  Then that's when I seen my brother get hit in the face with the baton by the police officer.  And me, as an older big sister, I get up on my knees and I just start hitting around -- I'm not sure if it was the cop that hit him or if it was a different cop at that time, but I just remember my first instinct was to protect my little brother and to do everything I can to make sure he's okay.  Like, he just got hit in the face.

So then I hit a cop.  And then -- then other people are being detained, and I'm looking around for my brother.  And as I'm hitting the cop, another cop grabs me and just, like, restrains me from hitting the cop and just like -- he's, like, holding me to the floor and at that time I'm, like, resisting -- I guess you could say resisting arrest because I'm, like, moving around a lot.  But the reason why I was moving around a lot was because I was trying to make sure my brother is okay.  I couldn't see him.  I don't know where he was.  Just trying to look out for my surroundings, like, where he was, make sure my brother is okay.

And then after that -- after that -- after that, I'm sitting there and -- I'm sitting there and they -- they pick my brother up.  They took him -- I don't know where.  They were walking him, maybe to the car or something.  And then that's when I tried to get up from the floor because I see that they're taking him somewhere.  So I'm trying to see where they are taking him and then that's when I tried to get up.  And as I'm trying to get up, the cop is, like, making fun of me for not being able to get up.  And then I fall to my knees because my knees were, like, really bloody and all scraped up, so then I fell again.  And then I just say "F it," and stay there.

And then -- then eventually the cop has me get up, and he's helping me get up and he's walking me towards -- I don't know where he was walking me towards.  And then words are being exchanged between me and the cop as he's walking me.  And I can't remember what words were being exchanged, but I know they weren't nice.  So that's when I kick my foot up and my foot hits the cop. I'm not sure where it hit the cop.  Yeah, my foot kicks up from the back and it hits him and then he sideswipes me from my feet onto the ground and that's all I remember.  After that was just -- it was blacked out for, like, five minutes.

Q.    Okay.  And what happened after five minutes?  Do you remember?

A.    After five minutes, they didn't even ask if I was okay.  Just grabbed me up and started walking me towards -- they just started walking

Q.   me towards -- I don't know where. I'm pretty sure it was the -- there was like an ambulance on the way for me, yeah. And then they started walking me and when the ambulance gets there, I remember they tried putting me on the stretcher. I am pretty sure that's what it's called, the stretcher. They tried putting me on there. Well, first they tried getting me up. They tried getting me up. And as I'm trying to get up, I lose consciousness again. I fall back down. So then one of the operators picks me up and then that's when I get onto the stretcher.

Q.   And they brought you into the ambulance?

A.   Yes.

Q.   Do you remember if anyone was in the ambulance with you?

A.   Just the ambulance people. That's all I remember. (Angelique, Pages 34-38)


Q.   Was that -- did he stay where he was behind her and push you from there?

A.   He moved. He, like, moved forward. Like walked in front of her and pushed me.

Q.   Okay. And that was while you were running up?

A.   Yes.

Q.   And you said you did not hear him saying anything?

A.   No. (Angelique, Pages 39-40)


In the record, as Angelique walked across the street, her brother, Alberto, who was no more than fifty feet from her, noticed her, as she walked across the street. Fearing that his sister might become embroiled in the clash, Alberto also walked across the street to Angelique's location. As Alberto walked across the street, he saw the officer push his sister down.

As Alberto has testified, he was very alarmed and concerned for his sister and eager to protect her from harm, He approached to see why they had been so significantly physical with his older sister. Alberto hoped to convince them not to further harm her. However, as Alberto, a juvenile, approached the Officers, Officer Hoqoq quickly used his baton to hit Alberto on his head. Officer Hoqoq swung so hard that Alberto immediately fell to the ground forcing his head to hit the concrete.

Page 6 of 31

Q.    Can you just walk me through what you remember from that point.

A.    Yeah. My sister -- I seen my sister going over there because she knew one of them was her friend, and so I went over there to go get my sister. But I noticed some -- some cops are, like, stepping up to my sister like as if she was a dude, you know, and just, like, talking aggressive already. I could already tell there was some aggression going on. I don't know if they had some personal stuff going on or something, but just from my perspective, it didn't look right. You know, like I could tell something was up already with that cop, and I just remember him just tossing my sister.

MR. MAGANA:    Let me interject one second. You're doing a great job, but if you could just bring your voice up just a little bit just for the court reporter. Her job is really super hard.

A.    Yeah.

MR. MAGANA:    Just to make sure she can hear you.

A.    Sorry about that. I'm trying to remember where I left off.

Q.    And I think you said you saw him do something to her.

A.    Yeah. He just -- I just seen him grab her by the shoulders and just toss her to the floor. And my reaction is like, you know, "That's my sister." I didn't come around, like -- like telling him anything or nothing. But after that -- honestly, so another cop just came up to me and smacked me in my face with a baton. From there I was just on the floor, and everything happened after that.

Q.    And do you remember anything that happened after you were on the floor?

A.    I had seen my cousins and my aunts getting pepper sprayed just for watching. And then after that, there was just like a lot of cops, like, being aggressive and one of them saying, "Stop resisting," when my hands are behind my back. And then I had, like, a cop's, like, knee on my back. I had a cop's knee on my head. And then after that, they -- they picked my sister up, and she was in handcuffs already, and then he just slammed her on the floor. They took me to the car after that. (Alberto, Pages 32-34)

While down and injured, Alberto was mounted by several Officers, and detained within seconds (as recorded). Accordingly, the course of mere seconds, Angelique and Alberto had been attacked by Officers, without any apparent cause or announcement (per the recordings).

It is necessary to note here that in any meaningful investigation and review, physical evidence is significant because physical evidence takes no side: and does not lose its memory: and documents the truth.  In that regard, the BWC recordings and the surveillance recordings (cited above) in this case require careful review.  My review of the recordings videos do not appear to support the claims by the SJPD in this incident.  In particular, the SJPD appear to have proffered a set of facts that is contrary to the recordings, witness statements, and the Plaintiffs' narratives.

The SJPC narrative is significantly different,, However, what is clear from the narrative neither Alberto or Angelique were armed.  In particular, Officer Hoqoq did not warn Alberto that he (Officer Hoqoq) would strike him (Alberto) in the head with a baton.

> "During this intervention, Officer Desouki was assaulted by the suspect and sustained injuries, reporting pain,  The surrounding crowd became hostile towards the officers.  As additional officers arrived, they formed a protective perimeter around Officer Desouki and the other arresting officers.
>
> "Officer Hoqoq arrived shortly thereafter and began ordering the hostile crowd to disperse.  A female suspect advanced towards Officer Hoqoq and the arresting officers, prompting Officer Hoqoq to push her back, causing her 10 fall.  Subsequently, a male suspect approached Officer Hoqoq With clenched fists and a combative stance.  Despite orders to retreat, the male suspect continued to advance.  In response, Officer Hoqoq struck the suspect in the race with his fist, noting in his report that although he was holding a baton, it did not make contact with the suspect.  Both the male and female suspects were subsequently taken into custody by other officers.
>
> "Later,  Officer Hoqoq was involved in clearing the parking lot of a crowd surrounding the arresting officers.  A suspect with a wooden cane and a knife in a sheath on his belt continued to advance toward Officer Hoqoq despite repeated commands to move back.  Officer Hoqoq then pushed the suspect back, causing him to fall.  The suspect, who claimed to have pre-existing medical conditions and was unable to get up, was provided medical aid at the scene.  He was subsequently cited and released."
> (SJ0244)

As testified Angelique observed her younger brother (Alberto) fall under attack by Officer Hoqoq.  She testified (quoted above) that she was shocked and believed that the officers were going to continue to harm her brother and therefore approached them and

used her hands on them to protect her baby brother. Officer Reynolds grabbed Angelique and yanked her back and forth.

Next, as the infliction of force continued, Mr. Cervantes saw that his son was down and injured. Mr. Cervantes approached the area where his son and daughter were being forcefully detained and manhandled and, typical to any father, attempted to mitigate the use of force being inflicted on his son and daughter he observed. Without warning, Sergeant McClure sprayed Mr. Cervantes in the face with O/C spray.

> Q. And you mentioned earlier that you saw him holding the mace. Was he already holding the mace when you first saw him?
> A. No. After I asked him the questions, he pulled it out, popped the top, shook it, and then he maced me.
> Q. And again, to the best of your memory and estimate, about how long passed between when he took the mace out of his belt and when he actually sprayed you?
> A. I don't know. I -- I guess I just -- what I remember was I asked him the questions, he didn't say nothing, had pulled the mace, popped it and sprayed me. So however long that takes, I can't really say. Whatever it is, a couple -- everything happened so quick. Like I said, just everything went in a cycle so...
> Q. So would you estimate it was --
> A. I don't know. I don't know. Five seconds, a couple seconds, five seconds. I -- I cannot tell you. (Andrew, Pages 65-66)

Next, Mr. Cervantes approached and was sprayed by O/C spray - an agent authorized only to overcome an actively resistant or assaultive suspect. Again, the Defendants' narrative appears to significantly differ from witness, body worn camera recordings and the Plaintiffs' narratives.

> "Sergeant McClure arrived at the scene shortly thereafter. As he approached, he observed a group of approximately six individuals moving towards the area. Sergeant McClure directed the group to stay out of the area, but they disregarded his orders and continued advancing toward the officers who were engaged in taking several suspects into custody.
>
> "Positioning himself between the advancing group and the arresting officers, Sergeant McClure issued clear commands for the group to stop. The group ignored these commands and continued to approach the ongoing

Page 9 of 31

*altercation, with some members expressing that the suspects being arrested were their family members. The individuals in the group were dressed in gang-affiliated attire and displayed a hostile demeanor toward law enforcement.*

*"Sergeant McClure positioned himself within 10-15 feet of the officers who were struggling to control the actively resisting suspects. He issued another verbal command for the approaching group to retreat and displayed his spray. Despite this, the group continued to advance in a hostile manner. Consequently, Sergeant McClure deployed the OC spray on the group. This action caused the group to retreat and leave the area. None of the individuals in the group were identified or arrested."* (SJ0246)

Thereafter, Officer Reynolds demanded that Angelique stand up, however, she had trouble standing on her own and fell twice. Angelique was finally able to stand and was led away while still handcuffed and while under the full control of the larger, stronger, and trained Officer Reynolds. While being led away, one of her legs allegedly went slightly towards Officer Reynolds who appears to have become instantly enraged.

Officer Reynolds, a trained and professional police officer escorting a handcuffed, small, juvenile female took Angelique face first into the concrete. As a foreseeable consequence, Officer Reynolds fractured Angelique's skull in the fall. The impact, caused Angelique to lose consciousness as a result of Officer Reynolds acts resulting in her face slamming into the cement.

In the profession, and in the SJPD, blows to the head - either by baton, fist, or contact with a hard object (cement) are considered a potentially lethal force. Yet I have noted in the record in this case that the Defendants' expert on use of force, Lieutenant Tassio, testified in his deposition that there is no specific training regarding safely assisting a handcuffed person to ground after a leg sweep has been applied. Also Lieutenant Tassio testified that the SJPD authorizes any force necessary to stop an alleged assault is authorized by the SJPD. This is clearly not correct. Had Angelique applied a deliberate kick to Office Reynolds' leg (as alleged by Officer Reynolds), while handcuffed and under his control she should never have been swept and pushed head first into the cement.

Q.    When an officer is taught to perform that maneuver, what is the
       training that is provided in terms of protecting the suspect's head?
MR. EGGLESTON:    Objection. Assumes facts not in evidence.
A.    I'm not sure that there's any specific training that would go along
       with a takedown maneuver. You tell the officers they need to protect

the suspect's head.  The point of the takedown maneuver is to overcome the immediate threat posed by the suspect.  So there's not a specific thing that the officer needs to do during that takedown to protect the suspect's head.

Q.     (By MR. MAGAÑA) Based off your training experience as a use-of-force analyst, is that not something that is of concern to the City of San Jose?

MR. EGGLESTON:        Objection. Vague and argumentative.

A.     I think that with any force application, the primary concern is for the officer, when they're doing justifiable force, or when they're using justifiable force, is to overcome that threat, with the understanding that injury may occur.  Injury may occur to the officer or it may occur to the suspect, and that's not ideal, but it is an unfortunate reality of police work.  Certainly, we want to mitigate whatever injury we can.  The best way to do that is for people to comply and we don't have to use force.  The next best way is for us to use the reasonable amount of force and then apply medical aid as soon as it's practical to do so afterwards if somebody's injured.  So we can't have a use of force that we can guarantee there's not going to be any injury, but we have to overcome that resistance and effect that arrest and make sure that our officers are safe.  So that's what the primary concern is with that -- with any force application, that it's reasonable and that we're using the force based on the totality of the circumstances. (Lee Tassio, Pages 46-47)

Again, the Defendants' set of facts appears in the record to differ significantly from video, witness and Plaintiff narratives:

> "Officer Reynolds arrived at the scene shortly after Officer Hoqoq.  Upon arrival, he observed a female suspect who had been involved in a physical altercation on the ground and was directed by other officers to take her into custody.  Officer Reynolds assisted Officer Bushunow in handcuffing the female suspect, who continued to resist even after being handcuffed.  Officer Reynolds remained with the suspect while Officer Bushunow assisted other officers.

> "Officer Reynolds attempted to help the suspect to her feet, but she refused his assistance and tried to stand up on her own.  The suspect, who was handcuffed behind her back and appeared to be intoxicated, struggled to get up.  Officer Reynolds attempted to assist her by pulling her up, but the

*suspect pulled away and fell.  She then yelled profanities at Officer Reynolds and kicked him in the leg.  In response, Officer Reynolds took hold of her arm and stood her up, maintaining a hold on her arm as he began walking her to the patrol cars.*

*"During this process, the suspect yelled at Officer Reynolds again and kicked him in the knee.  Officer Reynolds then used a leg sweep to take the suspect to the ground.  He maintained a hold on her arm and, based on body-worn camera (BWC) footage. appeared to attempt to control her fall.  Due to her apparent intoxication and lack of coordination, the suspect fell and struck her head on the pavement.  Officer Reynolds remained with her on the ground until other officers arrived to assist.*

*"The suspect was later transported to the hospital due to her head injury and was admitted for observation for a possible brain bleed.  She eventually recovered from her injury and was released from the hospital.  Officer Reynolds reported pain in his leg and knee but did not require medical treatment.* (SJO247-SJO248)

It is noteworthy here that Lieutenant Tassio has admitted that a baton blow to the head is a type of lethal force and should only be used in the direst of circumstances.  In this regard and in my opinion, the recordings, Plaintiffs' testimony, and other witness accounts, the interaction between Alberto and Officer Hoqoq required nothing more than simple verbal de-escalation skills.

> Q.    So I want to make sure I fully understand your position here, sir.  I don't want to put words in your mouth.  I don't want to, you know, assume anything.  Based off of your use-of-force review, the use of either a punch or a baton strike to the head of Mr. Ramirez was justified based off the totality of circumstances for Mr. Hoqoq?
>
> MR. EGGLESTON:    Objection. Vague and misstates the testimony. Go ahead.
>
> A.    Yeah, so that's -- that's not what I said.  What I said is that the use of a baton overall in this instance would be justified as an intermediate force option or a strike with a fist.  The policy clearly states that if you intentionally -- and the intentional part is the important part or the keyword there, the intentional striking of somebody in the head with a baton would be considered deadly force.  So a baton strike, which incidentally may strike somebody in the head, but is not intentional, would not be considered deadly force.  I don't believe

that, based on my analysis, Officer Hoqoq had the intent to strike Mr. Ramirez in the head with his baton based on the body-worn camera footage and his statements.  So I believe that his force was within policy. (Lee Tassio, Pages 15-16)

**San Jose Memorandum, Event Summary, Excerpt:**

The following excerpt is the SJPD evaluation of the incident and the use of force infected on this case:

*"BRIEF SUMMARY OF THE EVENT:*

*"On Sunday, May 5, 2024, law enforcement personnel were deployed to the area or Monterey Rd. and Southside Dr. in anticipation of Cinco de Mayo activities.  At approximately 1659 hours, reports or Sideshow activity prompted the dispatch of Mobile Field (MFF) teams to the location to establish traffic diversions and address the illegal sideshow activities.  The scene involved several hundred vehicles and spectators congregating at the intersection and nearby parking lots.*

*"Two MFF teams were mobilized and successfully implemented traffic diversions, effectively dispersing the illegal sideshow.  Despite this, large groups of spectators remained in the business parking lots around the intersection.  While officers noted some instances of minor illegal activities, such as public drinking, there were no reports of serious or violent crimes. Officers maintained their presence in the area for several hours, with traffic diversions still in effect.*

*"At approximately 2235 hours. officers observed a sizable gathering in the parking lot of La Canasta Market at 3074 Monterey Rd.  As officers approached, they identified several individuals engaged in physical altercations.  Officers intervened to separate the involved parties and halt the fighting.  However, their intervention was met with resistance from a crowd of approximately 30-40 onlookers, who became confrontational.  The crowd attempted to interfere with the officers' efforts to detain the suspects, necessitating a call for emergency assistance.*

*"Additional onlookers from surrounding areas also converged on the scene, further escalating the situation.  In total. four officers and one Sergeant*

Page 13 of  31

*used reportable force to overcome the resistance and prevent the suspects' escape.  The applied force included control holds, takedowns, and the use of chemical agents (OC spray).  One suspect sustained a head injury due to the use of force and required hospitalization for treatment.  Seven suspects were either arrested or cited during the incident.  Two officers reported pain from an assault by a suspect but did not require medical treatment.*

*"The use of force investigation was conducted on scene by Lieutenant M. White #4104, Sergeant B. Winco #3776, and Sergeant P. Nguyen #4129.*

*"BRIEF DESCRIPTION OF FORCE USED:*

- *Officer W. Hoqoq #4935 used control hold / takedown / strike with a body weapon. which resulted in a complaint of pain on three separate suspects.*
- *Officer S. Bushunow #4910 used a control hold / takedown on one suspect which resulted in a complaint of pain.*
- *Officer R. Reynolds #4t)83 used a control hold / takedown which resulted in a head injury requiring hospitalization on One suspect.*
- *Sergeant K. Mcclure #3979 used a chemical agent (OC spray) on approximately six identified suspects.*

*"As a result the use of force, one suspect suffered a head injury requiring admittance to the hospital for treatment.  The other suspects were treated by medics at the scene.  Two officers had a complaint of pain from the force but did not receive medical treatment." (SJ0242)*

**POST Force Options**

In California and throughout the nation, Officers are trained that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers.  The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer. (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative - Subject offers no resistance:*

- Mere professional appearance

- Nonverbal actions
- Verbal requests and commands

*Passive non-compliance - Does not respond to verbal commands but also offers no physical form of resistance:*

- Verbal requests and commands
- Officer's strength to take physical control, including lifting/carrying
- Control holds and techniques to direct movement or immobilize a subject

*Active resistance - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:*

- Control holds and techniques to control the subject and situation
- Use of personal weapons in self-defense and to gain advantage over the subject
- Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive - Aggressive or combative; attempting or threatening to assault the officer or another person:*

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening - Any action likely to result in serious injury or possibly the death of the officer or another person*

- Utilizing firearms or any other available weapon or action in defense of self and others

Officers are also trained that they must take into account the totality of the circumstances when selecting a reasonable force option. It is not the intent of this chart to imply that an

officer's force options are limited based on any single factor, and must be aware of and comply with their specific agency policies regarding appropriate force options.

Officers are also trained that they  must use the force option appropriate for the situation as conditions may change rapidly and must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.

**Training Regarding Blows/Kicks/Punches to the Vulnerable Parts of the Body:**

It is uncontested in the record that Angelique sustained a very significant head injury that appears consistent with the blow to her head.  As acknowledged, SJPD Officers are trained that blows to the head can result in serious injury and death.  As such required training must include not to use blows to the head absent the protection of life.  Angelique has testified that she merely approached her friend and was taken to the ground, handcuffed and then thrown (whild handcuffed) head-first ino the cement  In my opinion, no Officer's life was in danger; therefore, any blows to Angelique's head (including pushing her head first onto the cement while handcuffed, were out of policy.

> "Punches to the head or face can cause severe injuries to the individual, and additionally carry a high risk of injury to the deputy using such force. Deputies should only use this extremely dangerous level of force where lower force levels are not available or are ineffective, especially when the individual is already handcuffed and less severe use of force alternatives are available. See Graham, 490 U.S. at 396. LASD's Deputy Field Operations Manual and Defensive Tactics Manual state that "personnel are discouraged from striking an attacker's head with a fist," and encourages deputies "to use an open hand palm heel strike to lessen the potential of cutting injuries." LASD policy prescribing situational uses of force essentially ranks head strikes as akin to deadly force, stating they are appropriate only when a subject's behavior is "likely to result in serious injury or possibly in the death of a person." Punches to the face, as opposed to the head, are not considered deadly force, but this poor tactic can result in more injury to a subject and a deputy. The pattern of head and face strikes against handcuffed individuals we observed in LASD appears unreasonable under the Fourth Amendment." (DOJ Correspondence: "Investigation of Los Angeles County Sheriffs Department Stations in Antelope Valley," June 28, 2013, Page 32.)

**POST Training Regarding the Use of Impact Weapons (Baton):**

Andrew sustained injuries to the head, which appear consistent with blunt force caused by the Officer Hoqoq's baton.  The use of fists, knees, elbows or an impact weapon to the head is a very serious consideration.  POST training in this regard states:

> "Every peace officer must understand that an impact weapon (i.e. baton) should be used only when an officer is acting in a reasonable manner or to repel and protect in certain tactical considerations."  (Post Learning Domain #33.  Emphasis added.)

> "A peace officer's impact weapon is a deadly weapon as defined in Penal Code Section 22210.  In law enforcement, however, to be used In an authorized manner, it must be used reasonably to repel or protect."  (Post Learning Domain #33.)

> "Illegal use by an officer:

> "Any officer who uses an impact weapon against a subject beyond objectively reasonable (i.e., Graham vs. Connor) force can be criminally liable under the following statutes."

> "Penal Code 149:    Any officer unnecessarily assaulting or beating any person under color of authority."

> "Penal Code 245:    Assault with a deadly weapon or force likely to produce great bodily injury."  (Post Learning Domain #33,)

Further, officers are taught (and as recently stated by the 9th Circuit, *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011))  that among other obvious injuries, the use of the baton can cause deep bruising and clotting that can eventually reach the heart and/or lungs and cause stroke and/or death.  In the matrix of subject behaviors, the use an impact weapon is justified only as a response to aggressive or combative acts.  Officers have testified that they considered Andrew's behaviors a threat.  However, in my opinion, under these set of facts, the admitted blows to his head (per the injury inflicted) are not justified.

Accordingly, I am very concerned at the injurious blows inflected.  As stated above, any use of force must be considered by the "objectively reasonable" standard (as taught by

Page 17 of  31

POST).  In this regard, it is necessary to include the POST training given to all officers to consider the very serious consequences - including death - of baton blows to specific parts of the body and that any intentional strikes to these areas (such as occurred here) must be "objectively reasonable."  They are listed as (Learning Domain #33: "Arrest Methods/Defensive Tactics,".Use of Impact Weapons):

a.    Face;
b.    Throat;
c.    Heart;
d.    Groin;
e.    Head;
f.    Neck;
g.    Spine;
h.    Kidneys.

All police officers in California are required to understand and apply the California Penal Code.  It is uncontested per the testimony proffered by the Plaintiff's that the incident started when Angelique was suddenly pushed down when she approached her friend, Milly.  That was observed her brother and father and from their prospective as excessive force and they came to keep her from possible injury.  Such circumstances are not unusual in the general mix of police work.  Prudent and reasonably trained officers know how to deal with concerned family seeing force inflected on others.  Rather, sudden and potentially lethal uses of force by the SJPD occurred.

It must be noted here that the right to intervene and lawfully resist excessive force by an arrestee, the family or others is trained to all officers.  Officers are required to know that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested, family and/or others  may lawfully resist to overcome that force.  The following chart lists the applicable penal code sections:

*Section 692:*  Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties.

*Section 693*:  Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person, or his family or some member thereof.  To prevent an illegal attempt by force to take or injure property in his lawful possession.

*Section 694:*  Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense."

## Additional Opinions Thus Far:

1.  All Officers in California are trained that: An officer will be found to have used unreasonable force when the type, degree or duration of the force which was used is found to have been greater than that which was objectively reasonable under the totality of the circumstances confronting the officer at the time that the force was used." (POST LD #20).  Officers are also trained that they are required to use their authority reasonably

    "Peace officers must understand that the principles of deescalation can provide effective tools during contacts with the public and may result in improved decision-making, reduction in situational intensity, and providing outcomes with greater voluntary compliance."

    "Deescalation is the process of using strategies and techniques intended to decrease the intensity of the situation."

    "The highest priority of California law is safeguarding the life, dignity, and liberty of all persons, without prejudice to anyone.  Law enforcement officers shall be guided by the principle of reverence for human life in all investigative, enforcement, and other contacts between officers and members of the public.  When officers are called upon to detain or arrest a suspect who is uncooperative or actively resisting, may attempt to flee, poses a danger to others, or poses a danger to themselves, they should consider tactics and techniques that may persuade the suspect to voluntarily comply or may mitigate the needs to use a higher level of force to resolve the situation safely.

    "Vesting officers with the authority to use necessary force as determined by an objectively reasonable officer and to protect the public welfare requires monitoring, evaluation, and a careful balancing of all interests.  The authority to use force is a serious responsibility given to peace officers by

the people who expect them to exercise that authority judiciously and with respect for human rights, dignity, and life."

Accordingly, it is my opinion that the uses of force inflicted were excessive and unnecessary (as trained and defined by POST) because the entire series of events were easily dealt with by verbal skills and officer presence.

2.    I agree with Lieutenant Tassio that blows to the head are classified as lethal force.  Accordingly, the blows to the head that occurred were never justified.

3.    Officers are trained regarding how to control a handcuffed prisoner.  Using the trained method of escort prevents any opportunity to kick the escorting officer (as alleged) or to allow a fall.  I do not consider the explanation regarding Angelique's fall and catastrophic injuries as unavoidable supported by the physical evidence or testimony.

4.    Officers are trained by POST regarding the Federal requirements in the treatment and care of arrestees in their custody.  This did not occur in this incident.

After being handcuffed, Angelique was under the aegis of the Defendants, and they were responsible for her safety and well being, and had they employed the minimal degree of trained tactics for escorting handcuffed persons,  Angelique would not have fractured her skull.  In view of these facts, the Defendants' demonstrated a "callous disregard" for her safety and well-being in violation of policy, training and law (as taught to all officers). The POST training in this regard is as follows:

"Peace officers who have custody of arrested persons are lawfully responsible for the care and safekeeping of those individuals.

"Peace officers who have responsibility for arrested persons are liable for the safekeeping and standard of care of those persons. Failure to uphold the expected level of care under the provisions of state and federal laws or the callous disregard for an arrested person's safety will subject peace officers to:

- •    Departmental discipline (including termination).
- •    State prosecution for violation of penal code statutes.
- •    Federal prosecution for violation of federal civil rights law, and/or,

Maintaining officer and public safety.
- Civil lawsuits which may include punitive da1nages levied directly against individual officers" (LD 31: Chapter 1 -Peace Officer Responsibilities in a Custodial Situation.)

5. My review of the materials provided support the fact that none of the plaintiff's posed a credible threat to any Officer. As such, no physical force was necessary whatsoever. As noted above, Officers are trained that excessive force is defined as force that is not necessary or appropriate. Accordingly, the force inflicted by the Defendant Officers was excessive and in violation of police standards and policy (as trained)

6. Taking video evidence as true, and Plaintiff testimony, that the Plaintiffs never engaged in any attack on Officers and never uttered any threats, then the Defendants filed false police reports, when they stated that the Plaintiffs were immediate and significant threats to the Officers' safety. The Defendants have been taught at POST that deliberately making false statements in police reports is forbidden by law and can even constitute criminal conduct (as trained):

POST: Filing A False Report.

"When writing a report, the minimum requirements to accomplish your job ethically and preserve the integrity of the criminal justice system are:
- Never falsify any portion of your report or modify any aspect of the report away from the factual truth.
- Objectively document every fact (or piece of evidence) known to you that could prove or disprove the event you are reporting. If you are not sure, include the fact or piece of evidence anyway and qualify it as possible evidence or investigative information.
- Be clear. A well-written report does not raise questions, it answers them.
- Write your report free of speculation or personal opinions. You are there to gather facts.

"You are responsible for the quality of each report you write. Each

Page 21 of 31

report is an opportunity to build or destroy your credibility. Always write precisely what happened to the best of your knowledge. A report determined by a court to be compromised or unethical not only topples you credibility, but your agency's as well – plus it opens the door to challenge every past enforcement action you have performed. Compromising your report is just not worth it and it will raise questions about your effectiveness as a peace officer and may ultimately lead to termination of your employment. It is your obligation to report incidents just as they occurred; anything else is unethical." (POST Learning Domain #1: Chapter 2 - "Professionalism and Ethics in Policing.")

"Any officer who knowingly files a false report will be guilty of a crime. (Penal Code Section 118.1)

"All reports are to be true, unbiased, and unprejudiced. These are easy words to say, but sometimes hard to live by. It is not always easy to know or find out the truth. Clearly it is the peace officer's moral obligation to seek the truth, lying is wrong. Truth and public trust cannot be separated. (POST Learning Domain #16: LD 18: "Investigative Report Writing," pages 1-4 &5.)

7. Despite their apparent departures from the required POST training regarding using verbal de-escalation skills and the infliction of significant force against the Plaintiffs, the SJPD has endorsed their acts and they were returned to duty without apparent meaningful discipline and corrective retraining. Additionally, to my knowledge no new training has occurred and no new policies have been implemented since this incident.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by

the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

Page 23 of 31

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,600 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Iowa, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on

Page 25 of  31

the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, and on October 27, 2023. I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding

credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for

publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.  My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest.  My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness.  I was retained as consultant regarding the

October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers.  My consultations included recommendations and resulted in significant changes in policy and training by the MTS.  I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx)..  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.*  D.C. No. 4:19-cv-00301 KAW regarding use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.*  D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger."  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 - JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard.  My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force.  My opinions supported argument in the Ninth Circuit opinion, *SB v. County of San Diego*, 864 F. 3d 1010 - Court of Appeals, 9th Circuit, 2017.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort

to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children", pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016. I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions. I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney. On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate. On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights. I was the retained Use of Force consultant regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-0522-L NLS) and which was taken under formal consideration by the Inter-American Commission on Human Rights (an international human rights tribunal) on November 2022.

During my service on the LASD, I became aware of the existence of Deputy Gangs and in particular the "Vikings" Deputy Gang at Lynwood Station (LV-25)." Since 1980 I wrote significant in-house memorandums regarding the existence of Deputy Gangs and the harm they caused within the LASD. My first trial testimony as a consultant (1994) regarding Deputy gangs after my retirement was: *Thomas v. County of Los Angeles, 2:90-cv-05217* wherein I testified in Federal Court as an expert on Deputy Gangs. My consistent 30 year participation (with others) on this issue has now evolved in LASD Policy 3-01/050.82 - *Prohibition - Law Enforcement Gangs and Hate Groups* as defined and supported in Penal Code sections 13670(a)(2), 13670(b), 422.55, 13680(d) and 13680(e), 13670(b), 13682(a), 13682(b). 13670(b), 13510.9(a)(2), 13510.8, 13670(c), etc.

My most recent trial testimony regarding the Americans With Disabilities (ADA) rights and requirements (as trained by POST) was *Marina Borawick, v. City of Los Angeles, et al. Case No. 2:17-cv-02036 BRO-JC*, on March 30, 2023.

Additionally, a number of my cases have involved law enforcement officers as civil

Page 30 of 31

plaintiffs and as criminal defendants, and a number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS*, and on March 1, 2024 in *The State of Texas v, Deputy James Johnson and and Deputy Zachary Camden Judicial District Court Travis County (Texas) Case No.: DPS 09990017*. There are many others.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed March 13, 2026, at Santee, CA.

Roger A. Clark